**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 16, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RAYVELL VANN,

Defendant-Appellant.

No. 13-2190

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. 1:12-CR-00966-PJK-1)**

---

Margaret A. Katze, Assistant Federal Public Defender, Albuquerque, New Mexico, for Appellant.

James R.W. Braun, Assistant United States Attorney (Damon P. Martinez, United States Attorney, with him on the brief) Albuquerque, New Mexico, for Appellee.

---

Before **TYMKOVICH**, **GORSUCH**, and **PHILLIPS**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

Rayvell Vann was caught and convicted of carrying illegal drugs on an Amtrak train in New Mexico. He argues that he did not receive a fair trial because (1) the district court improperly denied his challenge to the government's

discriminatory strike of a potential juror because of the juror's race; (2) the court improperly allowed expert testimony about the habits of drug traffickers; and (3) closing arguments misstated and embellished the evidence. Vann also contends that the district court erred in permitting him to waive his right to counsel during sentencing and proceed *pro se*.

We conclude the district court did not err in finding the government's reasons for dismissing the contested juror were racially neutral; the expert's testimony was reliable based on his expertise and experience; and the prosecutor's closing argument was not plainly erroneous. Moreover, we find no error in the district court's decision to let Vann represent himself at sentencing. We exercise jurisdiction under 12 U.S.C. § 1291 and AFFIRM.

## I. Background

Vann paid cash for a one-way Amtrak ticket for a two-day train ride from Los Angeles to Kansas City two hours before the train was set to depart. From his post in New Mexico, Agent Kevin Small of the Drug Enforcement Agency was tipped by a confidential source about the unusual circumstances of Vann's Amtrak reservation.

When the train made its regularly scheduled stop in Albuquerque, Agent Small boarded the train and located Vann. After a brief conversation, Agent Small asked to search Vann's bags, and Vann consented. One of the bags

contained an out-of-place large pink gift box, and, after some discussion, Vann ultimately admitted that he was transporting codeine and painkiller pills.

Vann was arrested, and a magistrate judge issued Agent Small a warrant to search the gift box. When Agent Small and another federal officer opened the box, they found padding that resembled home-insulation foam. After cutting into the foam, an odor of ether percolated from it, and the officers moved the receptacle outside to finish the process. After they finally opened it, they found two bottles of codeine, twenty-five OxyContin pills, and two jars containing approximately 100 grams of phencyclidine (PCP) apiece.

Upon finding the narcotics, several officers, including Agent Small, interviewed Vann. During the interrogation, Vann admitted to dealing drugs in Nebraska and that he had purchased PCP in Los Angeles. He contended, however, that he had shipped the PCP he purchased via the United Parcel Service and thus did not know PCP was in the box.

He was charged with possession with intent to distribute phencyclidine and codeine. A jury found Vann guilty of both charges. At sentencing, Vann excused his attorneys and proceeded *pro se*, and the district court ultimately sentenced him to fifteen years in prison.

## II. Analysis

Vann raises four separate issues on appeal. *First*, he claims that the district court committed legal error during jury selection because it improperly

administered the three-part test under *Batson v. Kentucky*, 476 U.S. 79 (1986), after the government used a peremptory strike against the sole African-American member of the venire. *Second*, Vann contends that the district court abused its discretion by allowing Agent Small to testify as an expert at trial. *Third*, he argues the district court plainly erred when it failed to *sua sponte* object to alleged misstatements by the prosecution during closing arguments. And *fourth*, he asserts error in the district court's decision permitting him to waive his right to counsel during sentencing.

We address, and ultimately reject, each of these arguments.

### A. Batson

Vann first argues that the district court erred in rejecting a *Batson* challenge at trial and in a motion for a new trial.

In the seminal case *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court made clear that the purposeful exclusion of a juror on the basis of race runs afoul of equal-protection principles in violation of a criminal defendant's constitutional rights. As a result, it is impermissible for the prosecution, or any litigant for that matter, to use its challenges to strike a prospective jury member due to his or her race. *Id.* at 85–86.

*Batson* challenges are subject to the familiar burden-shifting framework that the Supreme Court further explained in *Johnson v. California*, 545 U.S. 162, 169–70 (2005):

-4-

*First*, the party challenging the strike as racially motivated "must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" *Id.* at 168 (quoting *Batson*, 476 U.S. at 93–94). If the district court moves on to steps two and three, as it did here, the "preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991).

*Second*, if the proponent of the *Batson* challenge meets its initial burden on the prima facie case, then "the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes." *Id.* (quoting *Batson*, 476 U.S. at 94). The standard here is not high: "Although the prosecutor must present a comprehensible reason, '[t]he second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices." *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quoting *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995)).

*Finally*, "'if a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.'" *Johnson*, 545 U.S. at 168 (quoting *Purkett*, 514 U.S. at 767). "This final step involves evaluating the 'persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'"

-5-

*Rice*, 546 U.S. at 338 (quoting *Purkett*, 514 U.S. at 768); *see also United States v. Nelson*, 450 F.3d 1201, 1207 (10th Cir. 2006).

We are concerned here only with the third step because each side concedes that its opponent met the burdens imposed at the first and second steps. The district court's obligation at step three is to consider "all of the circumstances that bear upon the issue of racial animosity." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008); *see also Miller-El v. Dretke*, 545 U.S. 231, 251–52 (2005) ("[T]he rule in *Batson* . . . requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it."). As our review of the district court's application of *Batson* is a matter of process, we cannot assume that the district court evaluated the prosecutor's credibility simply by virtue of its eventual ruling denying the *Batson* challenge. *Snyder*, 552 U.S. at 479.[1]

Turning to the record, we recognize that the district court's handling of the *Batson* challenge was streamlined. That said, at steps one and two, the *Batson* undertaking largely followed the blueprint. Indeed, after defendant raised the

---

[1] We review the district court's factual findings for clear error, *United States v. Williamson*, 53 F.3d 1500, 1508 (10th Cir. 1995), but we examine whether the district court applied the correct legal standard de novo, *see e.g.*, *United States v. Yarrington*, 640 F.3d 772, 778 (7th Cir. 2011). "The district court's answer to the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal because such a finding largely turns on the trial court's evaluation of the prosecutor's credibility." *Nelson*, 450 F.3d at 1207 (internal quotation marks and citations omitted). In this case, however, Vann has not argued that the district court's factual finding at *Batson*'s third step was clearly erroneous. For this reason, that argument is waived, and we do not address it here.

*Batson* challenge, the prosecution provided several nonracial reasons for striking the 49-year-old African-American juror:

> Your Honor, for starters, I had [this juror] singled out as a potential peremptory challenge prior to seeing him or knowing his ethnicity. [Co-counsel] can corroborate that.
>
> What I didn't like about him, and the racially neutral reason as to why I am striking him, with race being no consideration, is, number one, he didn't fill out the questionnaire. And I prefer having jurors that are educated, that have a stake in society, preferably with kids. He doesn't even list an occupation, he's seemingly unemployed. During the question-and-answer process, he seemed a little dazed and disengaged.
>
> So for those reasons, that's my basis for striking him. I mean, especially – I can present this questionnaire to the Court. It's not filled out. No, there's no indication that he has any type of family or any type of job.

App. Vol. V at 453–54.

The prosecution next submitted the questionnaire as evidence, and the district court prematurely noted that "I will rule on your *Batson* argument. Nonracial reasons were given that make sense." *Id.* at 454. Usually, the district court would invite defense counsel to offer countervailing reasons as a rebuttal immediately following the government's proffer of its nondiscriminatory reasons. This exchange would typically precede the district court's ultimate decision on whether the given nondiscriminatory reason for the strike was genuine.

-7-

In this case, however, defense counsel recognized it was yet to be heard and requested an opportunity to rebut the government's proposed reasons—the district court freely granted this request. Answering the call, defense counsel commented "[the juror] did respond when he was asked about prior juror service. He seemed attentive, articulate. I think there's—we think the reasons offered by the government are disingenuous." *Id.* After that, the district court renewed its prior decision, stating "[the *Batson* challenge is] overruled, and the juror is stricken." *Id.*

In light of those facts, the question we face is whether the district court committed legal error through its alleged failure to examine all of the circumstances surrounding the government's professed reasons to strike the only African-American member of the jury pool. As we have said, based on Supreme Court precedent, the judge is required to "assess the plausibility of [the government's nondiscriminatory] reason *in light of all evidence with a bearing on it.*" *Miller-El*, 545 U.S. at 251–52 (emphasis added). Vann contends, at bottom, that the district court abdicated this responsibility, particularly because the record provides scant evidence of how the district court came to the conclusion that the government's reasons were nondiscriminatory.[2]

_____

[2] Vann's briefing also implies that the district court's approach, in and of itself, amounts to a misapplication of *Batson*. This is wrong because the court corrected any out-of-order concern by allowing defense counsel to make a response on the record. In any event, no rule requires that the district court even

(continued...)

The record of the district court's analysis at this point is sparse, of course. But that is not all that was developed on the claim. After trial, the defense filed a Rule 33 motion, arguing that all of the government's race-neutral reasons for striking the African-American juror were pretextual. In this motion, defense counsel highlighted another member of the venire that was ultimately selected for jury service, whose questionnaire indicated that he might have been unemployed, like the stricken juror. It claimed this fact revealed the disingenuous nature of the government's employment-related reason. Furthermore, Vann noted that the juror the government peremptorily struck had completed two years of college, which negated another of the government's reasons; namely, that the juror was uneducated. As it had during jury selection, defense counsel also disputed the government's description of the juror's demeanor.

The government responded to the motion and reasserted several of its reasons for striking the African-American juror, particularly stressing both his idiosyncratic failure to properly fill out the juror questionnaire[3] and his demeanor.

<hr />

[2](...continued)
hear from the party opposing the strike, only that it consider all of the relevant evidence. *See Heno v. Sprint/United Management Co.*, 208 F.3d 847, 855 (10th Cir. 2000) (stating that the "trial court *should* ask challenging counsel to respond to the race-neutral reasons which have been proffered" (emphasis added)).

[3] Of potential jurors who filled out the same form as the stricken juror, only one left the identical employment sections blank. That juror was never reached during the selection process because the jury was assembled prior to her number being called. Two other jurors did a less-than-complete job of filling out

(continued...)

The government conceded that the stricken juror was as educated as persons selected to serve. It noted, however, that the juror's indication that he completed only two years of college and his failure to specify a major suggested that he might have dropped out of college—this factor buttressed their suspicion based on his demeanor that he was disconnected from society. The government additionally responded to Vann's argument about the similarly situated juror, a 65-year-old Hispanic man. It challenged the relevance of the comparison because the juror chosen (1) completed a questionnaire, which was different from the excluded juror's, that did not raise the same red flags for a failure to address several sections; and (2) was of retirement age and from an area where unemployment was more likely.

The district court denied the motion. First, it stated that the similarity of some of the responses of the potential jurors was not enough to undermine the prosecutor's race-neutral reasons. The court also found no showing of "purposeful discrimination," under *Batson* and that a "credibility finding" was "implicit in the rationale for denying the objection: the government's reasons were non-racial and rational." App. Vol. III at 164.

Based on our review of the entire record, we do not perceive a legal error in the application of the *Batson* test for several overlapping reasons. First, our case

---

[3](...continued)
the similar sections, and the government used peremptory challenges against both of them.

law makes clear that the district court does not need to make a finding on the record with respect to *how* it assessed the evidence to rule on the *Batson* challenge. *United States v. Castorena-Jaime*, 285 F.3d 916, 929 (10th Cir. 2002); *see also Saiz v. Ortiz*, 392 F.3d 1166, 1180 (10th Cir. 2004) ("While explicit rulings are preferable, we can conclude in this case that the trial court implicitly ruled that the explanations offered by the prosecution were credible, believable, and race-and/or gender-neutral.").[4] The bottom line is that a paucity of reasoning on the record to support the ultimate finding of nondiscrimination does not *per se* amount to a legal error in the application of *Batson*.

In addition, when viewed from a wider lens, simply no evidence of animus existed for the district court to consider at the time it made its decision. The impartial district court must rely on the presentation of the parties in issuing its final ruling on a *Batson* challenge because, of course, there is no "independent duty on the trial court to pore over the record and compare the characteristics of jurors, searching for evidence of pretext, absent any pretext argument or evidence presented by counsel." *Johnson v. Gibson*, 169 F.3d 1239, 1248 (10th Cir. 1999). And the record reveals that Vann did not present a comprehensive case during

---

[4] A number of cases that Vann cites from other circuits do require that the district court explicitly state its factual findings of the prosecution's credibility on the record. *See, e.g.*, *Rutledge*, 648 F.3d at 560 ("Here too we conclude that remand is necessary for the district court to make explicit credibility findings."). That rule does not come from the Supreme Court, however, and our prior decisions on this point control.

voir dire to counteract the government's nonracially-motivated proffer. The prosecution submitted at least four separate nonracial reasons as to why it used a peremptory challenge against the African-American juror. In response, defense counsel only addressed the demeanor-based reason.[5] That left a minimum of three nondiscriminatory reasons intact. At least with respect to those reasons, we can hardly criticize the district court's decision denying the *Batson* challenge because Vann "gave the district court no reasonable basis for questioning the government's credibility in offering its race-neutral reasons." *United States v. Smith*, 534 F.3d 1211, 1226 (10th Cir. 2008) (internal quotation marks omitted).

Logically construed, the best way to interpret this series of events is that Vann failed to carry his burden of persuasion to demonstrate to the district court that the prosecutor's use of a peremptory strike amounted to purposeful discrimination. This out-and-out failure is apparent on the record, and we refuse

---

[5] It is true that when the juror's demeanor is given as a reason for the strike, the trial court "must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Snyder*, 552 U.S. at 477. It is unclear how deep of a dive the district court took into the credibility of the demeanor-based reason for the government's peremptory strike. Given that the government provided three additional reasons, however, we are hard pressed to find error in not fully analyzing the question of the stricken juror's demeanor, notwithstanding the fact that the parties presented conflicting information.

to transform Vann's inadequate effort to respond to the government into an error by the district court.[6]

To be sure, Vann further challenged the government's proffered reasons after trial. With the benefit of hindsight, Vann constructed a rebuttal to the government's nondiscriminatory reasons, challenging each as pretext for the allegedly racially motivated strike. We have serious reservations about a litigant's decision to wait until his motion for a new trial to rebut certain of the government's reasons. Other circuits share this concern, and some have found a *Batson* proponent's failure to rebut the government's nondiscriminatory reasons

---

[6] Vann cites a number of extra-circuit cases where a court of appeals reversed the district court for failing to properly apply the *Batson* test. In many of those cases, the deficiency in the trial court's application of *Batson* was apparent. *See e.g.*, *Coombs v. Diguglielmo*, 616 F.3d 255, 263–64 (3d Cir. 2010) (finding that "it is clear from the record that the court effectively omitted the third step of the *Batson* inquiry by unreasonably limiting the defendant's opportunity to prove that the prosecutor's proffered reasons for striking Black jurors were pretextual, thereby improperly restricting the defendant's ability to prove discriminatory intent" and criticizing the district court's step two acceptance of the "prosecutor's vague and elusive explanation and the apparent concession that he was not sure why he stuck Juror No. 1"); *United States v. Collins*, 551 F.3d 914, 922–23 (9th Cir. 2009) (reversing because the district court incorrectly ruled that step one of *Batson* required a pattern of racially motivated strikes); *Jordan v. Lefevre*, 206 F.3d 196, 201 (2d Cir. 2009) ("In an effort to save 'an awful lot of time' [the trial judge] ruled summarily on the *Batson* application after an extremely brief colloquy, and resisted counsel's efforts to make arguments regarding the peremptory strikes so as to create a full record. The trial judge could not properly decide the third *Batson* step because he granted counsel no time to identify the relevant facts and assess the circumstances necessary to decide whether the race neutral reasons given were credible and nonpretextual. This cursory treatment of Jordan's *Batson* application was not a meaningful inquiry . . . .").

*during the voir dire process* amounts to forfeiture, *see United States v. Jackson*, 347 F.3d 598, 605 (6th Cir. 2003), or even waiver, *Wright v. Harris Cnty.*, 536 F.3d 436, 438 (5th Cir. 2008). Because we perceive no legal error by the district court under a less deferential standard, we need not go so far to decide this case.

We will say, however, that such a rule is intuitively appealing, especially insofar as it appropriately matches the never-shifting burden of the *Batson* proponent to prove discriminatory intent behind the striker's challenge. Practically speaking, a *Batson* challenge is best handled at the time when the judge and the attorney's conduct are at issue, especially in a case like this one where defense counsel asserts that evidence of pretext came to light *after* the striker defends against the *Batson* challenge but *before* the jury is empaneled. *See United States v. Hendrix*, 509 F.3d 362, 371 (7th Cir. 2007) (finding no error when defendant fails to "cast doubt" on the government's reasons "during voir dire"). Here, defense counsel could have specifically objected at any time during the process of voir dire. Yes, because the alleged pretext of some of the government's reasons may only have been discovered as they sifted through the remainder of the venire, it would not make sense to require an absolutely contemporaneous rebuttal. But once the jury was comprised, Vann could have renewed his *Batson* challenge based on the comparison with the allegedly similarly situated juror, and likewise with any other reasons that sprouted up. This would have allowed the trial court to consider the questionnaires side-by-

-14-

side to address the government's nondiscriminatory reasons. The fact that Vann waited until the jury was empaneled, the evidence was presented, and a verdict was rendered leaves the district court in a difficult spot. Instead, to preserve a *Batson* challenge, the best course of action is to address each of the government's reasons at the time they were offered or when additional information is developed during voir dire.

Even though we resist the application of waiver or forfeiture principles to Vann's delayed rebuttal, in our review for legal error we underscore the nature of the information that was before the district court *at the time of the* Batson *challenge*; particularly, the uncontradicted nonracial reasons that remained for the government's strike when jury selection closed. At that time, the district court was not presented with a side-by-side comparison of the stricken juror and his comparator. Nor did Vann challenge the government's proffer of a lack of education or unemployment as reasons for the strike. Given the evidence presented to the district court during voir dire, we cannot find legal error in how it handled the *Batson* challenge.

In any event, once the briefing on the motion for a new trial was before it, the district court reconsidered whether the nonracial reasons were pretextual based on the responsive reasons Vann provided. In other words, despite their untimeliness, those reasons were placed in front of the district court. But the end result was the same: Vann failed to meet his burden, and the district court

-15-

believed the government's proffer of nonracial reasons.  We thus ultimately cannot find error in the district court's process at any point in the timeline.

And finally, even though the district court's review here was done in an abbreviated fashion, "[w]e traditionally presume, absent some indication in the record suggesting otherwise, that trial judges are presumed to know the law and apply it in making their decisions." *United States v. Ruiz-Terrazas*, 477 F.3d 1196, 1201 (10th Cir. 2007) (quotation marks and alteration omitted).  As a legal matter, we are convinced that the district court's decision reflects a proper application of *Batson*—ending with a conclusion that, under the circumstances, the government's facially nonracial reasons were credible and Vann failed to meet his burden to demonstrate otherwise.[7]

Considering the relatively sparse record on review, however, we emphasize that trial courts play a "pivotal role in evaluating *Batson* claims," *Snyder*, 552 U.S. at 477, and are the gatekeepers of fair juries.  *Batson* cannot be reduced to a perfunctory check-the-box exercise, and, at step three, the district court must genuinely engage with the evidence presented by both sides to make a reasoned decision as to whether the government's proffered nondiscriminatory reasons are genuine.  We are satisfied that the district court did so here, but our task is

---

[7] Vann also contends that the district court's conclusion that "[n]onracial reasons were given that make sense" is only a step-two finding.  Based on the record, we are convinced that, when combined with the district court's reassertion that the *Batson* challenge was overruled because Vann failed to meet his burden, this was a step-three credibility finding.

-16-

considerably easier when we benefit from a factual record that memorializes the decision-making process at each step.

In sum, we find the district court did not err in rejecting Vann's *Batson* challenge.

### B. Expert Testimony

Vann also claims that the district court erroneously allowed Agent Small to testify as an expert at trial. He particularly objects to testimony opining that PCP wholesalers do not typically package PCP for buyers, which solicited an inference that Vann must have knowingly packaged the PCP himself. This inference aimed to show that Vann was aware that he possessed a controlled substance, a necessary element of the crime charged. We review the district court's decision to admit expert testimony for an abuse of discretion. *United States v. Orr*, 692 F.3d 1079, 1093–94 (10th Cir. 2012), *cert denied*, 133 S. Ct. 1300 (2013).[8]

Expert testimony is admissible if it meets the standard set forth in Rule 702 of the Federal Rules of Evidence: "A witness who is qualified as an expert by

---

[8] The government contends that Vann's failure to specifically object to the reliability of Agent Small's expert testimony leaves our review only for plain error. Vann objected to Agent Small's expert testimony in varying forms during a pretrial hearing and at trial, and we find these challenges sufficiently preserved the issue. And all things considered, this is not a case where a different result would occur as a result of our standard of review. For that reason, we review for an abuse of discretion.

knowledge, skill, experience, training, or education" can provide opinion

testimony if:

> a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> b) the testimony is based on sufficient facts or data;
>
> c) the testimony is the product of reliable principles and methods; and
>
> d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Thus, the district court "must satisfy itself that the proposed expert

testimony is both reliable and relevant, in that it will assist the trier of fact before,

permitting a jury to assess such testimony." *United States v. Rodriguez-Felix*,

450 F.3d 1117, 1122 (10th Cir. 2006). As we said in *United States v. Nacchio*,

this process has two parts:

> In determining whether expert testimony is admissible, the district court generally must first determine whether the expert is qualified "by knowledge, skill, experience, training, or education" to render an opinion. *See* Fed. R. Evid. 702. Second, if the expert is sufficiently qualified, the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in *Daubert*.

555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (citing *Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 U.S. 579 (1993)).

Vann does not claim error in the district court's finding that Agent Small was qualified to testify as an expert, and thus we only deal here with the reliability of the testimony. "[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999). Along these lines, "our cases do not require district courts to extensively explain their reliability determinations." *United States v. Avitia-Guillen*, 680 F.3d 1253, 1260 (10th Cir. 2012), *cert. denied*, 133 S. Ct. 466 (2012).

This court's decision in *United States v. Kamahele*, 748 F.3d 984 (10th Cir. 2014), explains the circumstances under which police officers can testify as experts. That case reaffirmed that "police officers can testify as experts based on their experience '[b]ecause the average juror is often innocent of the ways of the criminal underworld.'" *Id.* at 998 (quoting *United States v. Garcia*, 635 F.3d 472, 477 (10th Cir. 2011)). Moreover, *Kamahele* specifically collected cases in which the court had allowed police officers to testify as experts regarding "means and methods of drug dealing." *Id.* (mentioning at least six cases that fit this model). Ultimately, the court upheld the officer's testimony as an expert because he (1) "relied on multiple sources," (2) "based his expert testimony on years of experience," and (3) provided specific "insights into the distinctive traits" of his area of expertise. *Id.* at 998–99.

Vann claims Agent Small's testimony is unreliable because his experience in dealing with PCP is minimal and thus any criteria or data on which his opinions were based is insufficient. Furthermore, he argues that Agent Small fails to make a connection between some of the sources of his knowledge and his ultimate conclusions. But these arguments are unconvincing, especially insofar as Vann uses them to establish the district court's abuse of discretion. The district court properly vetted Agent Small through a *Daubert* hearing and at trial, consistently giving the parties an opportunity to present their case for why Agent Small should or should not be allowed to testify. This process reflects due deliberation in a decision to admit an expert's testimony as reliable. *United States v. West*, 671 F.3d 1195, 1201 n.6 (10th Cir. 2012). Indeed, on the basis of the record, this decision was well within the permissible scope of the district court's authority.

Even putting aside the deferential standard, Agent Small's competence and reliability as an expert is not subject to criticism under the circumstances. He had worked numerous drug interdictions, observed legions of drug-smuggling methods, and caucused with criminals and professionals alike regarding the "tools of the drug trade." This experience gave him dependable intelligence into the means and methods of drug transportation, as well as the typical relationship between wholesalers and dealers. And contrary to Vann's assertions, Agent Small's substantial experience in the drug trade generally is helpful in

establishing a foundation for his opinions and conclusions about PCP specifically. Regardless, Agent Small attested to numerous PCP arrests as well. Agent Small's opinion testimony, acquired through his experience, training, and expertise as a DEA agent, was properly grounded and well reasoned—in short, it was reliable.

Vann counters by pointing to a recent case where we found an abuse of discretion for admitting testimony of law enforcement personnel about drug traffickers display of "patron saints" for good luck while trafficking. *See United States v. Medina-Copete*, 757 F.3d 1092, 1105 (10th Cir. 2014). We held that it was inappropriate to admit speculative, meandering testimony regarding whether veneration of certain "narco" saints during a stop was evidence that the occupants of the vehicle knew that they were transporting drugs. Agent Small's testimony is not vulnerable to the same attack.

In addition, *Medina-Copete* is the exception not the rule, and, as noted, we have consistently allowed police officers to testify as to conclusions deriving from their expertise and experience. *Kamahele*, 748 F.3d at 999; *United States v. Vazquez*, 555 F.3d 923, 931 (10th Cir. 2009); *Garcia*, 635 F.3d at 477; *United States v. Sturmoski*, 971 F.2d 452, 459 (10th Cir. 1992); *see also United States v. Roach*, 582 F.3d 1192, 1206 (10th Cir. 2009) (collecting cases). At bottom, it is this circuit's longstanding view that "police officers can acquire specialized knowledge of criminal practices and thus the expertise to opine on such matters." *United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009).

In the end, Vann cannot show an abuse of discretion in the district court's

decision to admit Agent Small's expert testimony. As we noted in *Nacchio*, there

is no abuse of discretion when "[t]here was a sufficiently developed record, a

concrete reliability determination, and specific findings and discussion by the

district court." *Nacchio*, 555 F.3d at 1256.

### C. Prosecutorial Misconduct

Next, Vann claims the district court plainly erred in not *sua sponte*

addressing alleged prosecutorial misconduct during closing arguments at trial.

"[I]n cases of prosecutorial misconduct in which the defendant makes no

objection, our precedent limits us to plain error review." *United States v. Taylor*,

514 F.3d 1092, 1095 (10th Cir. 2008). "Plain error occurs when there is (1) error,

(2) that is plain, which (3) affects substantial rights, and which (4) seriously

affects the fairness, integrity, or public reputation of judicial proceedings."

*United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1222 (10th Cir. 2008)

(citations and quotation marks omitted).

We use a two-step process when considering claims of prosecutorial

misconduct. *United States v. Ivy*, 83 F.3d 1266, 1288 (10th Cir. 1996). First, we

determine whether the conduct was improper; if so, we decide whether the

improper conduct warrants relief. *Id.* On plain-error review, the burden is on the

defendant, and "reversal is warranted only when: (1) the prosecutor's statement is

plainly improper and (2) the defendant demonstrates that the improper statement

-22-

affected his or her substantial rights." *United States v. Fleming*, 667 F.3d 1098, 1103 (10th Cir. 2011); *see also United States v. Gonzalez-Montoya*, 161 F.3d 643, 650 (10th Cir. 1998) ("In evaluating . . . incidents [of prosecutorial misconduct] for plain error, we will reverse only if, after reviewing the entire record, we conclude that the error is obvious and one that would undermine the fairness of the trial and result in a miscarriage of justice." (quotation marks omitted)). "[R]eversal in the absence of contemporaneous objection is a rare exception rather than the rule." *United States v. Hill*, 749 F.3d 1250, 1267 (10th Cir. 2014).

"When evaluating allegedly inappropriate remarks of counsel for plain error, we must view the remarks in the context of the entire trial." *United States v. Lopez-Medina*, 596 F.3d 716, 738 (10th Cir. 2010) (quotation marks omitted). And even when a remark during closing arguments is improper, curative instructions will typically immunize such a statement from affecting defendant's substantial rights. *See United States v. Rogers*, 556 F.3d 1130, 1140–41 (10th Cir. 2009). Indeed, when "the jury was properly instructed that [statements and] arguments [of counsel] are not evidence and that [defendant] [c]ould only be convicted on the basis of evidence submitted at trial," *id.*, we have consistently refused to find plain error based on misstatements by the prosecutor. *See United States v. Fleming*, 667 F.3d 1098, 1106 (10th Cir. 2011).

Vann makes three claims of error, the first two of which target the prosecution's presentation of related circumstantial evidence in its theory of the

case at closing, a theory that Vann labels "demonstrably false." Aplt. Br. at 50. In short, the theory of the prosecution's case for conviction was that, because Vann could have without incident walked on a plane with the codeine and the painkillers, his decision to take a train must have been with an awareness that he was smuggling PCP. Broadly speaking, Vann contends that this theory misstates the evidence. First, Vann points to the fact that the names were scratched off the bottles of codeine in this case. That evidence partially runs counter to Agent Small's testimony that codeine is "something you can have with you on an airplane. Your name is on it, whatever, you can take it with you . . . It's not a difficult thing." App. Vol. V at 478–79. Thus, according to Vann, when the prosecution referred back to Agent Small's testimony during closing in order to support its theory, it did so deceptively.

Along the same lines, Vann argues that the prosecution's construction of the evidence in closing was improper because Agent Small testified at the *Daubert* hearing that he "intercepted a lot of codeine cough syrup on the trains." App. Vol. V at 229. As best as we can tell, Vann's complaint is that this concession weakened the inference regarding Vann's state of mind and this weakness should have been exposed to the jury. Taken together, these claims of errors find fault in the prosecutor's broad counterfactual codeine-on-an-airplane theory.

-24-

As an initial matter, Vann's argument misapprehends the purpose and nature of circumstantial evidence. Circumstantial evidence is indirect and thus it requires its proponent to ask that the jury draw a particular inference from certain information. Inferences vary in their strength, and the fact finder must evaluate whether an inference makes sense and weigh it accordingly. When a litigant argues that a piece of circumstantial evidence should lead the jury to a certain conclusion, that litigant is not committing misconduct or misstating the evidence—he is, to be blunt, lawyering. *United States v. Dazey*, 403 F.3d 1147, 1170 (10th Cir. 2005) ("The prosecutor is entitled to argue to the jury that it should draw reasonable inferences from the evidence to support the government's theory of the case.").

To prove that Vann knowingly transported the PCP, the government relied on a string of reasonable inferences—some stronger than others—that sought to show Vann's state of mind and knowledge. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required."). Given the abstract nature of the mens rea, this tactic is as uncontroversial as it is ubiquitous. *United States v. Santos*, 553 U.S. 507, 521 (2008) (finding that "knowledge must almost always be proved" by circumstantial evidence); *see also United States v. Haymond*, 672 F.3d 948, 957 (10th Cir. 2012), *cert. denied*, 132 S. Ct. 2789 (2012) ("[A] showing of

-25-

means rea may and often is inferred from circumstantial evidence." (internal citations and quotation marks omitted)).

Moreover, even conceding the alleged discrepancies between the evidence presented and statements made during closing, we simply do not see the prosecutor's statements as improper in any way, as they were "grounded in earlier testimony and . . . relevant to an element of the crime." *Stouffer v. Trammell*, 738 F.3d 1205, 1224 (10th Cir. 2013). Similar to the situation in *United States v. Woods*, 764 F.3d 1242 (10th Cir. 2014), these "comment[s] [are], at worst, ambiguous and allow[] for several interpretations." *Id.* at 1246. With respect to the first statement, placing all of the stock in Agent Small's comment that "[y]our name is on it" misses the mark. The point is that prescription medications, unlike substantial quantities of PCP (or another liquid), have a decent chance of making it through the airport security, whether in your carry-on or checked bag (and regardless of whether the names were displayed on the bottles). This was all part and parcel of a theory that someone carrying PCP may choose Amtrak.

Nor does the fact that Agent Small had previously intercepted criminals transporting codeine on trains transform the prosecution's theory into an impropriety. In Vann's view, the government's theory was entirely deductive— all drug dealers knowingly carrying only codeine use airplanes exclusively; Vann took a train; Vann was knowingly carrying more than codeine. Thus, says Vann, Agent Small's concession that he has picked up codeine transporters on the train

reveals a logical fallacy. Of course, this indisputable syllogism was not the government's case; rather, it simply argued that, in conjunction with the other evidence, it was unlikely that Vann would have taken the train unless he knew he was carrying PCP. Ultimately, the fact that the government's theory was not airtight does not mean that it misstated the evidence. To be sure, the government's theory is weakened by the fact that persons carrying codeine have been caught on trains or that the codeine bottles were without names, but that does not reveal the prosecutors' misconduct. Sliced any way, these statements were not plainly improper.

In addition, the district court instructed the jury that the lawyers' "statements and arguments are not evidence," App. Vol. I at 511, and the prosecutor even issued the same caution at the outset of his closing argument, "[i]t's always important to keep in mind that whatever us lawyers say, that is not evidence, so you need to go with your own memory of the testimony and the evidence, and make sure that everything that's said is in line with the evidence," App. Vol. 5 at 620–21. In light of these efforts to mitigate any misstatements—to the extent they can be considered misstatements—any error by the district court in not responding *sua sponte* is not reversible on plain-error review.

And finally, assuming for the sake of argument that the district court erred, the unobstructed admission of these statements did not affect Vann's substantial rights. *United States v. Rosales-Miranda*, 755 F.3d 1253, 1258 (10th Cir. 2014)

("An error seriously affects the defendant's substantial rights . . . when the defendant demonstrates that there is a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." (internal quotation marks and citation omitted)). Although it was circumstantial, the government presented significant evidence to permit a reasonable fact finder to conclude beyond a reasonable doubt that Vann *knowingly* possessed the PCP, including: (1) evidence that he admitted during an interview to purchasing PCP in Los Angeles; (2) evidence that he admitted to dealing drugs; (3) evidence of the suspicious plane-one-way-train-the-other travel plan; (4) evidence of his demeanor and inculpatory statements when confronted on the train; (5) evidence that it is unnecessary to travel to Los Angeles to purchase codeine and OxyContin; and (6) evidence that drug dealers typically purchase PCP out of Los Angeles. By any standard, the evidence was enough for the jury to convict without the alleged misstatements. *See Woods*, 764 F.3d at 1248 (explaining that where the other evidence of guilt is strong, any error by the district court in not correcting alleged prosecutorial misstatements does not affect defendant's substantial rights). For this reason, Vann's substantial rights were not affected by the alleged misstatements.

On the third claim of misconduct, Vann claims the government improperly argued in rebuttal that the typical lower-level drug transporter, or "mule," regularly breaks down when he finds that he is carrying more than he bargained

for. The government described Vann's reticent reaction to the revelation that the agents found PCP in the box and used this argument to contend that Vann must have known he was carrying the PCP. The government had not, however, presented this as evidence during trial through the testimony of Agent Small or otherwise—a fact the government concedes. Aple. Br. at 28. Taken in context, however, this comment was merely a description of Vann's reaction and demeanor when he was arrested. It was meant to emphasize the casualness and acknowledgment of the circumstances of his arrest.

In any event, we have held in the past that a reference to facts not in evidence does not necessarily constitute plain error mandating reversal. *See United States v. Oles*, 994 F.2d 1519, 1524 (10th Cir. 1993). Furthermore, in a nearly identical context, we have found that a curative instruction negates the effect of the prosecution's reference to facts outside of evidence in rebuttal. *See United States v. Lawson*, 968 F.2d 21, at *3 (10th Cir. 1992) (unpublished table decision). In this case, the district court provided a curative instruction.

In sum, even assuming this was an error, it was neither plain nor did it affect substantial rights for all of the reasons expressed above.

### D. Waiver of Right to Counsel

Finally, Vann argues that he did not knowingly waive his right to counsel at sentencing.

We review the validity of a waiver to the right to counsel de novo. *United States v. Turner*, 287 F.3d 980, 983 (10th Cir. 2002). It is well-settled that a criminal defendant retains his right to counsel during the sentencing phase of his case. *Gardner v. Florida*, 430 U.S. 349, 358 (1977). At any phase of the judicial proceedings, a defendant is permitted to represent himself as a matter of right, *Faretta v. California*, 422 U.S. 806, 819 (1975), and can do so by waiving his right to counsel. The waiver, however, must be "an intentional relinquishment or abandonment of a known right or privilege." *United States v. McConnell*, 749 F.2d 1441, 1450–51 (10th Cir. 1984).

In the normal course, we examine whether a defendant has effectively waived his right to counsel under a two-part test. "First, we must determine whether the defendant voluntarily waived his right to counsel [and] [s]econd, we must determine whether the defendant's waiver of his right to counsel was made knowingly and intelligently." *United States v. Taylor*, 113 F.3d 1136, 1140 (10th Cir. 1997). In this case, the voluntariness of Vann's waiver is not suspected; thus, only the second prong is at issue.

We reflect on the totality of the circumstances to decide whether a defendant has knowingly decided to proceed *pro se*. As we have noted, the true test for an intelligent waiver "turns not only on the state of the record, but on all the circumstances of the case, including the defendant's age and education, his

-30-

previous experience with criminal trials, and representation by counsel before trial." *United States v. Padilla*, 819 F.2d 952, 958 (10th Cir. 1987).

To this end, the tried-and-true method for establishing that a waiver was knowing and intelligent is to "conduct a thorough and comprehensive formal inquiry of the defendant on the record to demonstrate that the defendant is aware of the nature of the charges, the range of allowable punishments and possible defenses, and is fully informed of the risks of proceeding pro se." *United States v. Willie*, 941 F.2d 1384, 1388 (10th Cir. 1991). This so-called *Faretta* hearing ensures the defendant is not unwittingly or impulsively disposing of his constitutional right to counsel.

And while the hearing itself is a known quantity, we have recognized that "[t]here are certain limited situations . . . where a waiver may be valid" even when the inquiry by the court is deficient. *United States v. Hughes*, 191 F.3d 1317, 1323 (10th Cir. 1999). In *Hughes*, for example, we found that "a waiver may be valid absent an inquiry by the court where 'the surrounding facts and circumstances, including [the defendant's] background and conduct, demonstrate that [the defendant] actually understood his right to counsel and the difficulties of *pro se* representation and knowingly and intelligently waived his right to counsel.'" *Id.* (quoting *Willie*, 941 F.3d at 1389) (brackets in *Hughes*).

All of this goes to say that the *Faretta* hearing is one way—probably the best way—for the district court to satisfy itself that defendant's waiver of a right

-31-

to counsel was done intelligently.  But as the Eleventh Circuit persuasively concluded in a recent case, a *Faretta* hearing is only "a means to [an] end" of ensuring a voluntary and intelligent waiver, and the absence of that means is "not error as a matter of law."  *United States v. Stanley*, 739 F.3d 633, 645 (11th Cir. 2014), *cert. denied*, 134 S. Ct. 2317 (2014).  In other words, a contemporaneous and comprehensive hearing is generally a sufficient condition to a knowing waiver, but it is not a necessary one.

Moreover, although the timing of the *Faretta* hearing is certainly important, other courts have found that a proper *Faretta* hearing is not negated when defendant hesitates or declines to proceed *pro se* initially before later reasserting an interest to do so.  *United States v. Modena*, 302 F.3d 626, 631 (6th Cir. 2002) ("Although Modena had an interim change of heart regarding his decision to proceed pro se, he ultimately gave the district court no reason to suspect that he was uncertain about representing himself.").  That point resonates here, as the government concedes that the district court did not perform a "thorough and comprehensive formal inquiry" of Vann immediately preceding his waiver during sentencing.  *See* Aple. Br. at 32–33.

Instead, the government contends that the inquiry performed in advance of trial was sufficient to satisfy the requirement.  At that hearing, Vann ultimately withdrew his request to represent himself, but the court satisfactorily explained the dangers of self-representation.  As we see it, there is no question that the

-32-

district court's colloquy was sufficient vis-à-vis Vann's trial representation: the court thoroughly examined defendant and articulated the responsibilities and drawbacks of representing oneself. App. Vol. V at 265–73.

The inquiry prior to sentencing, by contrast, did not go into the same depth, and Vann stresses that the three-month span between trial and sentencing essentially neutralizes the efficacy of the earlier hearing. Prior to sentencing, the court did, however, discuss with Vann the problems that he was having with his lawyers and queried why he wanted to relieve them of their representation. The court also informed defendant that it thought his current counsel was competent and would do a better job advocating for Vann during the sentencing phase than he could do himself. Importantly, the district court also expressed concern about the delays associated with finding new attorneys, noting that "[y]ou have had two sets of lawyers. You have fired them both. Now, you want additional ones, and it's just delay." App. Vol. V at 703. Nevertheless, Vann chose to self-represent.

It is clear from the record that the circumstances of this case permitted the district court to forego an additional comprehensive inquiry into waiver. In the main, the district court had explained the risks of self-representation throughout, including the detailed discussion prior to trial. Vann points to no case holding that an earlier, in-depth *Faretta* hearing cannot satisfy the constitutional standard when a defendant later waives his right to counsel. In the same vein, we have found nothing authoritative that requires a separate hearing of equal depth each

-33-

time the option of proceeding *pro se* arises. Such a rule would be unworkable. Again, the standard is simply that defendant is fully aware of the consequences of his decision to proceed without counsel.[9] The district court found that he was, and we agree.

To be sure, a better course of action might be to re-conduct the colloquy to confirm the waiver. Still, in light of the district court's ongoing dialogue with defendant regarding his issues with his attorneys and his desire for self-representation, the district court correctly assessed the totality of the circumstances surrounding defendant's decision to excuse his attorneys and did not err in concluding that Vann's waiver was knowing and intelligent.

## III. Conclusion

We AFFIRM the district court's decision.

---

[9] The district court's concern that Vann was delaying the proceedings by firing counsel and requesting new lawyers also brings this case directly into the guidance of *Hughes*, which found that purposeful delay by defendant evidenced a valid waiver. *See Hughes*, 191 F.3d at 1324. Thus, the district court's awareness of possible dilatory tactics further supports the decision to forego a subsequent *Faretta* hearing.