# IN THE SUPREME COURT OF THE STATE OF NEVADA

JUAN VALENZUELA SANCHEZ,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 66964

**FILED**

JUL 1 4 2016

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY S. Young
DEPUTY CLERK

## *ORDER OF REVERSAL AND REMAND*

This is an appeal from a judgment of conviction, pursuant to a jury verdict, of two counts of trafficking in a controlled substance. Eighth Judicial District Court, Clark County; Stefany Miley, Judge.

Appellant Juan Sanchez asserts seven assignments of error, including that the district court erred in overruling his objections pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986). For the reasons below, we agree.[1]

During voir dire, the State successfully challenged a prospective juror, who was African-American, for cause. The State subsequently used two peremptory challenges on African-American jurors: prospective juror no. 655 and prospective juror no. 662, the only remaining

---

[1]We note that Sanchez also appeals his conviction based on sufficiency of the evidence. After considering this claim, we conclude that it lacks merit. *See McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992) (explaining that the standard of review when analyzing the sufficiency of the evidence "in a criminal case is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt") (internal quotations omitted). In light of our decision in this matter, we need not consider Sanchez's other assignments of error.

African-American jurors left on the panel. As a result, Sanchez objected under *Batson* and attempted to establish a prima facie case of racial discrimination. In response and prior to a determination from the district court, the State initially noted that *Batson* pertained to "minorities in general" and that the panel included "several minorities, including several people of Latino [descent,] which [was] the same as the defendant here." The State offered its race-neutral reasons for each challenged juror. With regard to prospective juror no. 655, the State explained "that she had been accused of a crime, and when she was responding to the questions, [the State] felt like she still had an attitude in that." The State later clarified that "she seemed to have an attitude in the tone of her voice" and provided "very short" answers.[2] With regard to prospective juror no. 662, the State explained that it challenged her because "she seemed very young" and uninterested. In particular, the State claimed that during voir dire, she mentioned she drew a lot but "lack[ed] motivation" to take art classes. Thus, according to the State, if she "lack[ed] motivation in any other part of [her] life, [she is] likely to do that here . . . and just not pay attention."

---

[2]The dissent notes that the State did not realize that prospective juror no. 655 was African-American and that the State believed this juror exhibited an attitude during voir dire. However, the dissent's emphasis on this part of the record is misplaced. First, in our analysis, we considered all relevant circumstances, which included not only the State's questioning during voir dire but also the district court's failure to conduct a proper analysis under *Batson*. Second, the State's claim that it did not realize the juror was African-American is not a factor negating an inference of racial discrimination. As discussed below, a sensitive inquiry into the circumstantial and direct evidence of intent supports a pretext for racial discrimination.

 

Ultimately, the district court overruled both of Sanchez's objections. The court summarily determined "that the State has offered a race-neutral reason for utilizing" its peremptory challenges. Further, the court noted that while it did not "visibly appear that [there were] other dark-skinned individuals indicating that [they were] of African-American" descent, there were "a number of individuals who appear[ed] to be of other ethnic [descent], such as several seem[ed] to have Latino last names." Thus, the court concluded that Sanchez's objection was "going to be denied."[3]

The use of peremptory challenges to racially discriminate violates the Equal Protection Clause. *Batson*, 476 U.S. at 85. Further, discriminatory jury selection constitutes structural error and mandates reversal. *Diomampo v. State*, 124 Nev. 414, 423, 185 P.3d 1031, 1037 (2008). This court has adopted the three-step *Batson* analysis, as enumerated in *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995). Step one of the *Purkett* analysis requires the opponent of the peremptory challenge to

---

[3]The dissent argues that the district court was asked to address and resolve the third step of *Batson* and confirm that the representations made by the State were "consistent with what was said during voir dire." However, the dissent's emphasis on this part of the record does not establish that the district court conducted a proper analysis under *Batson*. We have instructed district courts to undertake a sensitive inquiry into circumstantial and direct evidence of intent, as well as consider all relevant circumstances. *See Conner v. State*, 130 Nev., Adv. Op. 49, 327 P.3d 503, 509 (2014), *cert. denied*, ___ U.S. ___, 135 S. Ct. 2351 (2015). Here, the record demonstrates that the district court did neither. The court's analysis is limited and conclusory, and a significant portion – the finding that several of the prospective jurors apparently belonged to the same racial group as Sanchez – is irrelevant and faulty. In fact, the third step appears to be more of an afterthought, to which only two brief statements are dedicated, rather than a factor given serious consideration.

establish a prima facie case of racial discrimination. *Id.* at 767. Notably, a defendant does not need to belong to the same racial group as the prospective jurors to raise a challenge under *Batson*. *Kaczmarek v. State*, 120 Nev. 314, 333, 91 P.3d 16, 29 (2004). For step two, "the burden of production shifts to the proponent of the strike" to proffer "a race-neutral explanation" for the challenge. *Purkett*, 514 U.S. at 767. Finally, step three provides that based on the race-neutral explanation, the district court "decide[s] . . . whether the opponent of the strike has proved purposeful racial discrimination." *Id.* This court has previously advised "district courts to clearly spell out the three-step analysis" when conducting a *Batson* analysis. *Kaczmarek*, 120 Nev. at 334, 91 P.3d at 30 (internal quotation omitted). A "district court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available and consider all relevant circumstances before ruling on a *Batson* objection." *Conner v. State*, 130 Nev., Adv. Op. 49, 327 P.3d 503, 509 (2014) (internal quotations omitted), *cert. denied*, ___ U.S. ___, 135 S. Ct. 2351 (2015).

With regard to a *Batson* challenge, this court generally gives great deference to the district court's decision on the issue of discriminatory intent. *Diomampo*, 124 Nev. at 422-23, 185 P.3d at 1036-37. Thus, we will only reverse if the decision is clearly erroneous. *Kaczmarek*, 120 Nev. at 334, 91 P.3d at 30. In our analysis, we consider "the similarity of answers to voir dire questions given by [minority] prospective jurors who were struck . . . and answers by [nonminority] prospective jurors who were not struck," as well as "the disparate questioning by the prosecutors of [minority] and [nonminority] prospective jurors." *Hawkins v. State*, 127 Nev. 575, 578, 256 P.3d 965, 967 (2011)

(alteration in original) (internal quotations omitted). In evaluating a race-neutral explanation, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768. Although the proponent "must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges" and the reason must be "related to the particular case," a legitimate reason is not necessarily a reason that "makes sense." *Id.* at 768-69 (internal quotations omitted). Rather, it is merely one "that does not deny equal protection." *Id.* at 769. However, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Miller–El v. Dretke*, 545 U.S. 231, 241 (2005). We emphasize the importance of this analysis, as "[c]ompliance with *Batson* is essential to ensure that defendants receive a fair trial and to preserve the public confidence upon which our system of criminal justice depends." *Foster v. Chatman*, 578 U.S. \_\_\_, 136 S. Ct. 1737, 1760 (2016) (Alito, J., concurring).

Here, we initially note that we need not decide whether Sanchez established a prima facie case of discrimination because the State offered its explanations prior to the district court's determination. *See Ford v. State*, 122 Nev. 398, 403, 132 P.3d 574, 577 (2006) (stating that when "the State gave its reasons for its peremptory challenges before the district court determined whether the opponent of the challenge made a prima facie showing of discrimination," the step was moot). Further, we note that the district court's discussion of its decision does not clearly spell out the three-step analysis, as we have previously advised. Instead, the district court summarily stated its decision. In addition, the court's

 

comment that several of the prospective jurors belonged to the same racial group as Sanchez is not relevant to an analysis under *Batson*. *See Kaczmarek*, 120 Nev. at 333, 91 P.3d at 29 (noting "the progress of federal constitutional law holding that a defendant need not belong to the same group as the prospective jurors in order to challenge their exclusion on grounds of discrimination"). Regardless, an independent examination of the record demonstrates that two *Batson* violations occurred.

*Prospective juror no. 655*

Prospective juror no. 655 stated that she previously had been accused of a crime, but the charges were dropped. When the court asked prospective juror no. 655 if she could be fair during trial, her response was transcribed as inaudible. The court immediately replied, "Yes, okay." In addition, the State did not ask prospective juror no. 655 any questions during voir dire, nor did it challenge her for cause. This strongly suggests that her response was in the affirmative.

Two other jurors admitted to being accused of a crime in the past: prospective juror no. 189 and prospective juror no. 820.[4] Prospective juror no. 189 was accused of two crimes, but both cases were dismissed. He was also convicted of a felony; his record was sealed, and all of his civil rights were restored. When the court questioned whether he could be fair, he stated, "Oh, absolutely." He again reiterated that he "can be fair in this case." Soon after, the State asked prospective juror no. 189 if he felt he was treated fairly by the police and the court system, and he agreed. When Sanchez questioned prospective juror no. 189 about his past, he

---

[4]We note that the record is unclear as to whether prospective juror no. 189 and prospective juror no. 820 were minority or nonminority prospective jurors.

responded with the following: "We have laws. I believe in respecting the laws. If we want to break the laws, even if we disagree with them, I believe that I am and everyone else should be held accountable if [we are] found to have broken those laws." He also emphasized that his past "will absolutely not affect" his deliberations in this case. The State decided not to use a peremptory challenge on prospective juror no. 189. In addition, prospective juror no. 820 was accused of a crime in the past. When the court asked if she could be fair in this case, she replied, "Yes." The State did not ask any questions of prospective juror no. 820, nor did it use a peremptory challenge on her. Ultimately, both prospective juror no. 189 and prospective juror no. 820 were selected as jurors in Sanchez's trial. Prospective juror no. 189 served as the foreperson, while prospective juror no. 820 appears to have been an alternate juror.

The record demonstrates that the State's explanation for its peremptory challenge of prospective juror no. 655 was a pretext for racial discrimination. First, her answers parallel those of other prospective jurors. When the court asked prospective juror no. 655 if she could be fair during this trial, her response was transcribed as inaudible. However, both the response of the district court and the State strongly suggest that she responded she could be fair. Likewise, as discussed above, two other prospective jurors responded that they could be fair. Second, we conclude that there is disparate questioning. The State asked prospective juror no. 189 a series of questions,[5] while the State failed to question prospective

_____

[5]The dissent argues that there was not disparate questioning between prospective juror no. 655 and prospective juror no. 189, emphasizing that the State only asked prospective juror no. 189 three questions. It is true that the State asked prospective juror no. 189 three

*continued on next page...*

SUPREME COURT
OF
NEVADA

(O) 1947A

7

juror no. 655 at all. Moreover, although the State did not question prospective juror no. 820 either, the State declined to use a peremptory challenge against her, nor did it claim that she exhibited the same "attitude" that prospective juror no. 655 allegedly exhibited. In fact, upon review of the record, the responses that prospective juror no. 820 gave were also brief, just as the State claims the responses of prospective juror no. 655 were. Nevertheless, both prospective juror no. 189 and prospective juror no. 820 were selected to serve on Sanchez's jury.

Considering all relevant circumstances, the State's reasons to challenge prospective juror no. 655 evince pretext. If the State was concerned with prospective juror no. 655's attitude toward the criminal justice system or her inability to serve fairly on a jury, the State could have questioned her. The State's failure to do so, combined with its failure to strike similarly situated jurors and its disparate questioning, raises suspicion as to discriminatory jury selection. Further, the district court did not conduct a proper analysis under *Batson*. In particular, the court did not clearly spell out the three-step analysis, and it mistakenly emphasized that several of the prospective jurors belonged to the same racial group as Sanchez. Thus, we conclude that the district court erred

---

*...continued*

questions, but this nevertheless was three more than what was asked of prospective juror no. 655. Even though the State claimed that it was concerned by the attitude that prospective juror no. 655 expressed toward her criminal history, the State failed to ask a single question about this subject, or any questions at all. As explained below, if the State was concerned with prospective juror no. 655's attitude toward the criminal justice system or her inability to serve fairly on a jury, as it apparently was about prospective juror no. 189, the State could have questioned her. Thus, the record demonstrates the existence of disparate questioning.

by overruling Sanchez's objection to the State's peremptory challenge, and this clearly erroneous decision mandates reversal.

*Prospective juror no. 662*

During voir dire, the district court questioned prospective juror no. 662 about her employment. She responded that she had been working for three years at a local theme park, where she ran ticket sales and the cash register. Thereafter, the State questioned prospective juror no. 662 about what she does outside of her career. She responded that she "usually just [took] care of" her mother. When the State asked if there were any groups to which she belonged or certain hobbies that she liked, she stated that she "[drew] a lot." Finally, the State asked if she took any art classes, to which she replied that she "lack[ed] the motivation."

The State questioned three other jurors about their hobbies: prospective juror no. 755, prospective juror no. 705, and prospective juror no. 714.[6] First, prospective juror no. 755 stated that he "read a lot," including such material as "business stuff" and "anything related to HVAC and energy." When the State asked about what he enjoyed doing for fun, he stated he was an "[o]utdoors guy" who liked to "be outside" and "stay active." He mentioned participating in a bowling league, as well as playing softball. Second, prospective juror no. 705 stated she worked a lot and was also a student. In her spare time, she "like[d] to run." Then, the State questioned her about her studies, to which she elaborated that she was a student of psychology and wanted to pursue social work. Finally, the State asked prospective juror no. 714 about her hobbies. She stated

---

[6]We note that the record is unclear as to whether prospective juror no. 755, prospective juror no. 705, and prospective juror no. 714 were minority or nonminority prospective jurors.

 

that she was also a student of psychology. She wanted to pursue psychiatry and thus "spen[t] a lot of time on that." When the State asked if she wanted to be a psychiatrist, she replied, "Yes."

Again, the record demonstrates that the State's explanation for its peremptory challenge of prospective juror no. 662 was a pretext for racial discrimination. Significantly, her answers parallel those of other prospective jurors. Outside of her employment, prospective juror no. 662 cared for her mother and enjoyed drawing. Likewise, three other prospective jurors briefly discussed their interests outside of their work or future career path. Similar to prospective juror no. 662, none of these jurors suggested that their hobbies have evolved into passions that require strenuous training or enrollment in courses. In fact, prospective juror no. 714 failed to answer the State's question altogether, only emphasizing that she studied psychology but declining to mention any interests outside of her future career path. However, prospective juror no. 662 was the only juror whose character was doubted. To question prospective juror no. 662's interest in the case, simply because she has not formally been trained as an artist, in addition to the responsibilities of taking care of her mother and working at a career for three years that involves the handling of her company's finances, is an argument that "reeks of afterthought." *Miller–El*, 545 U.S. at 246.

Further, if the State was truly concerned that prospective juror no. 662's lack of motivation to enroll in art classes would somehow impact her ability to serve fairly on a jury, the State could have questioned her further. Instead, the State simply refused to do so, failing to ask any additional questions as to this topic. Finally, as we discussed above, the district court did not conduct a proper analysis under *Batson*. As the

SUPREME COURT
OF
NEVAOA

(O) 1947A

dissent notes, "[i]t is almost impossible for this court to determine if the reason for the peremptory challenge is pretextual without adequate development in the district court." *Hawkins v. State*, 127 Nev. 575, 579, 256 P.3d 965, 968 (2011). We agree. It is for this very reason that we determine that the district court failed to develop an adequate record before ruling on the *Batson* objection. Instead of conducting a sensitive inquiry into circumstantial and direct evidence of intent and considering all relevant circumstances, as we have previously advised, the district court tacitly agreed with the State's representations without any significant analysis. Thus, we conclude that the district court erred by overruling Sanchez's objection to the State's peremptory challenge, and this clearly erroneous decision mandates reversal.

Considering all relevant circumstances in this case, sufficient evidence exists to demonstrate a pretext of racial discrimination. In evaluating the use of peremptory challenges in a racially discriminatory way, we must ensure that the State and the district court comply with *Batson*; otherwise, if we decline to do so, we compromise a defendant's right to a fair trial and undermine the public confidence upon which our system of criminal justice depends. As recently emphasized by the United States Supreme Court, "[t]wo peremptory strikes on the basis of race are two more than the Constitution allows." *Foster v. Chatman*, 578 U.S. ___, 136 S. Ct. 1737, 1755 (2016). Accordingly, we

ORDER the judgment of conviction REVERSED AND REMAND this matter to the district court for proceedings consistent with this order.

_____, C.J.
Parraguirre

_____, J.
Douglas

_____, J.
Cherry

_____, J.
Saitta

_____, J.
Gibbons

cc:  Hon. Stefany Miley, District Judge
     Clark County Public Defender
     Attorney General/Carson City
     Clark County District Attorney
     Eighth District Court Clerk

PICKERING, J., with whom HARDESTY, J., agrees, concurring in part and dissenting in part:

Batson v. Kentucky, 476 U.S. 79, 96-98 (1986), directs a three-step analysis to determine whether a peremptory challenge violates the Equal Protection Clause of the Fourteenth Amendment. "First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." Snyder v. Louisiana, 552 U.S. 472, 476-77 (2008) (internal quotations omitted). Here, the State concedes Sanchez's prima facie showing, and Sanchez does not creditably deny that the reasons the State gave for its peremptory challenges qualified as race neutral. See Purkett v. Elem, 514 U.S. 765, 767-68 (1995) (noting that under Batson, "once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two)," but that "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible," just one that is "facial[ly] valid[ ]"). Thus, only Batson's third step—purposeful racial discrimination by the prosecuting attorney—is at issue on this appeal.

The majority reverses Sanchez's judgment of conviction based on its finding that the prosecuting attorney engaged in purposeful racial discrimination when she exercised a peremptory challenge against jurors

SUPREME COURT
OF
NEVAOA

(O) 1947A

nos. 655 and 662. "Whether a prosecutor intended to discriminate on the basis of race in challenging potential jurors is, as *Batson* recognized, a question of historical fact." *Hernandez v. New York*, 500 U.S. 352, 367 (1991). As a question of fact, a district court's finding "on the issue of discriminatory intent" is binding on the reviewing court unless the product of "clear error." *Conner v. State*, 130 Nev., Adv. Op. 49, 327 P.3d 503, 508 (2014), *cert. denied*, ___ U.S. ___, 135 S. Ct. 2351 (2015). Under the "clear error" standard, a reviewing court "will not reverse a lower court's finding of fact simply because [it] would have decided the [factual dispute] differently." *Snyder*, 552 U.S. at 486 (Thomas, J., dissenting) (quoting *Easley v. Cromartie*, 532 U.S. 234, 242 (2001)). Rather, "a reviewing court must ask 'whether, on the entire evidence, it is left with the definite and firm conviction that a mistake has been committed.'" *Id.* at 487 (quoting *Easley*, 532 U.S. at 242).

Here, direct evidence that improper racial discrimination motivated the prosecutor's peremptory challenges of jurors nos. 655 and 662 does not appear. *But cf. Foster v. Chatman*, 578 U.S. ___, 136 S. Ct. 1737, 1743 (2016) (reversing as clearly erroneous the Georgia courts' rejection of a capital defendant's *Batson* challenge, where the state prosecutor's file, obtained post-trial pursuant to an open records request, highlighted every black juror's name, marked each as a "definite NO," and indicated, "If it comes down to having to pick one of the black jurors, [this one] might be okay"). Thus, we must determine whether the record before us contains sufficient circumstantial evidence of unlawful racial discrimination by the prosecutor to deem the district court's contrary finding clear error. As proof of the prosecutor's peremptory challenges were racially motivated, both Sanchez and the majority rely chiefly on

comparative juror analysis—comparing the voir dire answers of non-minority jurors whom the State kept with those of the minority jurors it challenged, to show the reasons given for the challenges were pretextual. *Compare Ford v. State*, 122 Nev. 398, 405, 132 P.3d 574, 578-79 (2006) (discussing comparative juror analysis), *with People v. Lenix*, 187 P.3d 946, 964 (Cal. 2008) (noting that "[c]omparative juror analysis is a form of circumstantial evidence" and that, while "circumstantial evidence may support a logical conclusion that the disputed fact is true[,] . . . information may often be open to more than one reasonable deduction"). Given the "particular care [that] must be taken when relying on circumstantial evidence," *Lenix*, 187 P.3d at 964, especially where, as is the case with juror no. 662, the evidence was not developed or argued in the district court, I cannot agree that the district court committed clear error when it rejected the defense's *Batson* challenges to the prosecutor's strike of jurors nos. 655 and 662.

A.    Juror No. 655

The district court conducted much of the voir dire in this case. During the court's questioning, two jurors, juror nos. 189 and 655, disclosed that they had prior criminal histories. The defense and the prosecution disagreed on what they saw and heard when these jurors were questioned. To defense counsel, the two jurors appeared indistinguishable except that juror no. 655 was African-American and juror no. 189 was not; both had been accused of crimes in the past, with juror no. 189's charge being more serious. But the prosecutor saw things differently. First, she expressed surprise at the *Batson* challenge, stating that she "didn't even realize that [juror no. 655] was African American." Then, she volunteered that she struck juror no. 655 yet kept juror no. 189 because, after juror no.

SUPREME COURT
OF
NEVADA

(O) 1947A

3

655 "indicated that she had been accused of a crime, and when she was responding to the questions, I felt like she still had an attitude in that," while juror no. 189 "went on to elaborate that he now respects—respects the law. He felt that he was treated very fairly."[1] In response, defense counsel disputed the prosecutor's observations—"And she [juror no. 655] had an attitude? . . . I noticed no discernible attitude. . . . I didn't see anything"—prompting the prosecutor to reiterate, "with [juror no. 655], I felt that when she was answering Your Honor's questions [about her criminal history] she was very short, and she seemed to have an attitude in the tone of her voice."

The district judge deemed the reason the prosecutor gave for striking juror no. 655 (negative attitude when asked about prior theft charges) to be "race-neutral," then observed that "a number of individuals who appear to be of other ethnic d[esc]ent" remained in the venire. The district judge did not stop there, as the majority suggests. Defense counsel asked the court to address and resolve the "third part about Batson . . . not just that there is race-neutral reasons but that the Court also visibly saw the same thing that the prosecution saw," which the district judge then did: "what I saw would back up [the] State's contentions. The

---

[1]Evidently, juror no. 189 had been convicted of a felony 40 years earlier, but the conviction was expunged and his civil rights restored; he also had a more recent domestic violence arrest. The defense describes juror no. 189 as white and represents that the 24 prospective jurors qualified by the court's voir dire included only three African-Americans, while the State represents that the 24 prospective jurors included an unspecified number of Latinos and other minorities, an assertion the district court confirmed.

representations she [the prosecutor] made are consistent with what was said during voir dire."

What we have, then, are divergent accounts by the trial lawyers of how jurors nos. 189 and 655 reacted in voir dire to the judge questioning them about their criminal histories—with the district court explicitly endorsing the prosecutor's account. Applying the "clear error" standard our caselaw and that of the Supreme Court establish, this court should uphold, not reverse, the district court as to juror 655. *Hernandez*, 500 U.S. at 369 ("where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous") (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)).

A not dissimilar record came before the Supreme Court in *Hernandez*, where a state-court defendant raised a *Batson* challenge to the prosecution's peremptory strikes against two Latino jurors, which, with the prosecution's previous for-cause strikes, left the jury without any Latino or Hispanic members.[2] The defendant in *Hernandez*, himself a Latino, argued that the race-neutral reason given for the strikes (that bilingual jurors might second-guess the court interpreter) was pretextual and that the New York state courts clearly erred when they held otherwise. *See* 500 U.S. at 366-67. Writing for a three-judge plurality,[3]

---

[2]The *Hernandez* opinion notes that it refers to the excluded jurors as "Latino" because the parties did so in their briefs, though they referred to them as "Hispanic" in the trial court. 500 U.S. at 355. We do the same.

[3]Justices O'Connor and Scalia concurred, but "believe[d] that the plurality opinion goes further than it needs to in assessing the constitutionality of the prosecutor's asserted justification for his
*continued on next page . . .*

Justice Kennedy rejected the proposition that a reviewing court can or should second-guess a trial court's assessment of the demeanor of the lawyer exercising the strike in deciding whether the race-neutral reason given was genuine or a pretext for invidious racial discrimination. *Id.* at 364. "As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." *Id.* at 365 (internal quotation omitted). Continuing, Justice Kennedy wrote:

> We discern no clear error in the state trial court's determination that the prosecutor did not discriminate on the basis of the ethnicity of Latino jurors. . . . [W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. The trial court took a permissible view of the evidence in crediting the prosecutor's explanation. Apart from the prosecutor's demeanor, which of course we have no opportunity to review, the court could have relied on the facts that the prosecutor defended his use of peremptory challenges without being asked to do so by the judge, that he did not know which jurors were Latinos, and that the ethnicity of the victims and prosecution witnesses tended to undercut any motive to exclude Latinos from the jury. Any of these factors could be taken as evidence of the prosecutor's sincerity. The trial court, moreover, could rely on the fact that only three challenged jurors can with confidence be identified as Latinos, and that the prosecutor had

_____

. . . *continued*

peremptory strikes." *Hernandez*, 500 U.S. at 372 (O'Connor, J., concurring).

a verifiable and legitimate explanation for two of those challenges. Given these factors, that the prosecutor also excluded one or two Latino venirepersons on the basis of a subjective criterion having a disproportionate impact on Latinos does not leave us with a definite and firm conviction that a mistake has been committed.

*Id.* at 369-70 (citation omitted) (internal quotations omitted).

The defense's pretext claim as to juror no. 655 required the district court to assess the demeanor of both jurors and that of the prosecutor who exercised the strike against her. *See Thaler v. Haynes,* 559 U.S. 43, 49 (2010) ("when the explanation for a peremptory challenge invoke[s] a juror's demeanor, the trial judge's firsthand observations are of great importance") (alteration in original; internal quotations omitted). These are fact- and credibility-intensive determinations. And here, as in *Hernandez,* the record contains evidence supporting the district court's determination that the prosecutor did not strike juror no. 655 based on her race, including that the prosecutor defended her peremptory strike without being asked to do so, *see Hernandez,* 500 U.S. at 369, that the prosecutor did not know juror no. 655 was African-American until after she exercised the strike, *see id.; United States v. Watford,* 468 F.3d 891, 913 (6th Cir. 2006) (where the prosecutor represented that he did not know the struck juror was African-American, "we are hard-pressed, on the record before us, to find discriminatory intent inherent in the proffered explanation"), and the district court's acceptance of the prosecutor's observations about the demeanor of jurors nos. 189 and 655.

The majority cites the prosecutor's "disparate questioning" of jurors nos. 189 and 655 to support its clear-error finding. Respectfully, I disagree. As noted, the district court conducted most of the voir dire in this case. Of the 24 prospective jurors the district court preliminarily

qualified, the prosecutor questioned just seven of them, leaving the remaining 17 in peace. While the prosecutor did question juror no. 189, she asked him just three questions, not the "series of questions" the majority depicts. And, the questions asked were benign, more designed to introduce the prosecutor to the jury or, maybe, to tease out a basis for a possible for-cause challenge of that juror, than to differentiate a white juror with a criminal history from an African-American juror with less of one. In this and in the brevity of the questioning, the prosecutor's voir dire did not differ much from the defense's similarly limited voir dire. It evidenced follow-up on a juror with an expunged felony in his background, not pretext.

B. Juror No. 662

The majority also finds a *Batson* violation with respect to juror no. 662. It bases its finding on a comparative juror analysis it undertakes between juror no. 662, whom the State explained it struck because she was young and stated that she "lacked motivation," and jurors nos. 705, 714, and 755, whom the majority finds similarly situated to juror no. 662, except that they were not peremptorily challenged. Of note, the defense did not make in district court the comparative juror argument the majority now accepts. Here is the complete transcript of the comparative juror analysis offered in district court as to juror no. 662:

> Defense: I would say, with respect to [juror no. 662], the fact that she's young, there's a number of young people on the jury of different ethnicity. So that doesn't matter. That's completely pretextual. Interested in art, I mean, I don't know what that has to do with anything regarding her qualifications to be a juror. I mean, everyone kind of described things that they do in their lives.

And, I think [the prosecutor] said she looked bored. I mean, [quite] frankly, Judge, most of the people up there look pretty bored. It's a jury trial. No one likes to sit on jury duty.

The majority's finding of similarity between juror no. 662, on the one hand, and jurors nos. 705, 714, and 755, on the other hand, thus depends entirely on its reading of the voir dire transcript. The district court was not asked to, and did not, make findings respecting the similarity among these jurors and whether, given those similarities, the prosecutor's stated concern about juror no. 662's statement that she "lack[s] motivation" was a pretext for illegal race discrimination.

"It is almost impossible for this court to determine if the reason for the peremptory challenge is pretextual without adequate development in the district court." *Hawkins v. State*, 127 Nev. 575, 579, 256 P.3d 965, 968 (2011). Especially is this true in the context of comparative juror evidence sought to be developed for the first time in the context of a *Batson* challenge on appeal. As the California Supreme Court noted in *Lenix*, 187 P.3d at 962, "comparative juror evidence is most effectively considered in the trial court where the defendant can make an inclusive record, where the prosecutor can respond to the alleged similarities, and where the trial court can evaluate those arguments based on what it has seen and heard." *Compare United States v. Houston*, 456 F.3d 1328, 1338 (11th Cir. 2006) (when comparative juror analysis is raised for the first time on appeal, the appellate court lacks the "benefit of the prosecutor's explanation for why he struck the black venire members rather than the white venire members now alleged to be similarly situated" and the "benefit of a finding by the trial judge as to the credibility of such explanations"), *with State v. Shipman*, 64 A.3d 338, 346 (Conn. App. 2013) (rejecting comparative juror claim made for the first

SUPREME COURT
OF
NEVADA

(O) 1947A

9

time on appeal where, as here, the races of the relevant venirepersons were not established in the district court, requiring the reviewing court to speculate).

This appeal illustrates the hazards of undertaking comparative juror analysis for the first time on appeal. To begin with, as the majority notes, *ante* at 10 n.6, we do not even know "whether prospective juror no. 755, prospective juror no. 705, and prospective juror no. 714 were minority or nonminority prospective jurors," given that no comparative juror argument was made as to them in district court. *See Shipman*, 64 A.3d at 346. We also do not know their ages, that of juror no. 662, or that of any other juror (except juror no. 124, aged 20, who was excused for cause). And, although the majority finds otherwise, the record suggests fewer similarities than differences between juror no. 662, on the one hand, and jurors nos. 705, 714, and 755, on the other hand. Thus, voir dire established that juror no. 662 had been employed at Circus Circus Adventuredome Theme Park in "ticket sales and the cash register" for three years; that this was the only job she had held; that apart from looking after her mom, and liking to draw, she was not married and did not "have any groups that [she] belong[ed] to or certain hobbies that [she] like[d] to do"; and that when asked, "Have you ever taken any art classes," she stated, "No. I lack the motivation." Juror nos. 705, 714, and 755, by contrast, had worked for a number of years; juror nos. 705 and 714 were, in addition to their jobs, attending the College of Southern Nevada to earn their degrees to pursue careers in social work and psychiatry; and juror no. 755, a mechanical contractor with a background in HVAC, professed to spend his time reading journals related to his work. Because the comparative juror analysis undertaken on this appeal was not made in

the district court, we do not know how the district court perceived the demeanor of and differences among these jurors. What we do know, though, from the record itself is that the similarities of these jurors is not so striking that the district court committed clear error in not sua sponte rejecting the prosecutor's peremptory challenge of juror no. 662 based on her similarity to juror nos. 705, 714, and 755. While comparative juror analysis has been undertaken for the first time on appeal in certain instances, it is inappropriate to do so where, as here, the record is not adequate to permit meaningful analysis of the comparisons urged.

C.  Lack of findings.

As a reviewing court, "we traditionally presume, absent some indication in the record suggesting otherwise, that trial judges . . . know the law and apply it in making their decisions." *United States v. Vann*, 776 F.3d 746, 756 (10th Cir.), *cert. denied*, ___ U.S. ___, 136 S. Ct. 434 (2015). Despite this rule, the majority faults the district court for not making more elaborate findings than it did. But the district court's findings were driven by, and commensurate with, the arguments counsel made. *Cf. Thaler*, 559 U.S. at 49 (reversing and remanding a Court of Appeals decision finding a state-court *Batson* violation based on a lack of express findings by the trial court and noting that neither *Batson* nor its progeny supports a "categorical rule" that absent certain findings a reviewing court should automatically find a *Batson* violation). As to juror no. 655, the district judge credited the prosecutor's account, as she was entitled to do, including that juror no. 655 exhibited a negative attitude toward the government that juror no. 189 did not. As for juror no. 662, the district court would have had to be prescient to make comparative juror findings as to jurors nos. 705, 714, and 755, since comparative juror

analysis as to them was not argued in district court. *Hawkins*, 127 Nev. at 579, 256 P.3d at 967 ("*Batson* does not impose 'an independent duty on the trial court to pore over the record and compare the characteristics of jurors, searching for evidence of pretext, absent any pretext argument or evidence presented by counsel.'") (quoting *Johnson v. Gibson*, 169 F.3d 1239, 1248 (10th Cir. 1999)). Logically, the record supports that Sanchez failed to carry his burden of demonstrating to the district court that the prosecutor's peremptory strikes amounted to purposeful discrimination. It is inappropriate, I submit, to transform this failure of proof into clear error by the district court. *See Vann*, 776 F.3d at 755.

For these reasons, with the exception of footnote 1 of the majority's order, in which I join, I respectfully dissent.

_____, J.
Pickering

I concur:

_____, J.
Hardesty